**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

_____

**EVERTON WAGSTAFFE,**                          )
                                                )
   **Plaintiff,**                  )
                                                )
      v.            )     **VERIFIED COMPLAINT**
                                                )     **AND JURY DEMAND**
**THE CITY OF NEW YORK, a municipal entity;** )
**MICHAEL RACE, in his individual capacity;**   )
**GEORGE HOHENSTEIN, in his individual**        )
**capacity; JEFFREY WRIGHT, in his individual** )
**capacity; JAMES CURRAN, in his individual**   )
**capacity; DAVID CARBONE, in his individual**  )
**capacity; MARK BROOKS, in his individual**    )
**capacity; CHARLES HECKER, in his individual** )
**capacity; DUGGAN, first name unknown,**       )
**in his individual capacity;**                 )
**CARRICE COLES; and OTHER**                    )
**AS-YET-UNKNOWN JOHN and**                     )
**JANE DOES OFFICERS & SUPERVISORS**            )
**1–10, in their individual capacities,**       )
                                                )
   **Defendants.**                 )
_____ )

    Plaintiff Everton Wagstaffe, by and through his attorneys, the law firm of Beldock Levine & Hoffman LLP, states as follows:

**INTRODUCTION**

    1.    The 75th precinct of the New York Police Department (NYPD) in the early 1990's is one of the most notorious examples of unchecked police corruption and misconduct in the City's history.  The 1992 arrest of Officer Michael Dowd for running a large-scale drug distribution operation out of the precinct led to establishment of the Mollen Commission, which spent twenty-two months between 1992 and 1994 investigating police corruption throughout the NYPD over the previous decade and found "a system that had virtually collapsed years ago" and commanders

1

who had abandoned "oversight of and commitment . . . to any component of the anti-corruption apparatus." Defendant Michael Race, the sergeant in charge of the 1992 investigation of the crime at issue in this case, admitted that of the 750 murder investigations he supervised at the 75th Precinct, only one was done correctly.

2.      The record-setting violence and chaos of East New York in the early 1990s fostered this misconduct. Confronted with an escalating number of homicides and a drug trade spiraling out of control, 75th Precinct detectives closed cases quickly, often using illegal investigatory tactics, such as fabricating statements from unreliable would-be informants and presenting them as reliable, first-hand accounts.

3.      The investigation at issue in this civil rights lawsuit is a textbook example of that misconduct. Everton Wagstaffe, who had nothing to do with and knew nothing about the 1992 murder of sixteen-year-old Jennifer Negron was wrongly targeted by the Police Defendants and eventually convicted of her kidnapping as a result of Defendants' misconduct.

4.      To frame Everton Wagstaffe and his criminal case co-defendant Reginald Connor for the kidnapping and murder of Jennifer Negron, detectives from the 75th Precinct fabricated a statement from a regular police informant implicating Mr. Wagstaffe and Mr. Connor in the crime; bolstered this false account with another fabricated but consistent statement from the victim's close friend; and coerced both the informant and the friend into falsely identifying a vehicle as the one used in the crime.  The Police Defendants then hid their misconduct, falsely representing that the informant was the original source of Mr. Connor and Mr. Wagstaffe's names.  Records clearly contradict this account, proving that the Police Defendants were focusing on Mr. Connor before they ever spoke to the informant, and on Mr. Wagstaffe before the informant allegedly identified him from a photograph.

5.      Early in the morning on New Year's Day, 1992, the body of sixteen-year-old Jennifer Negron was found half-naked on the side of a road in the East New York neighborhood of Brooklyn, several miles away from her residence address.  Initial police investigation on January 1, 1992, included information about prior drug related disputes between Negron and a male youth near the Cypress Hills projects located several long blocks away from where her body was found.

6.      The Defendant Detectives immediately targeted Reginald "Reggie" Connor in the investigation.   Rather than conducting a lawful investigation into Ms. Negron's death, Police Defendants coerced false statements and fabricated physical evidence and ignored other leads in order to falsely implicate Mr. Connor and another man, Everton Wagstaffe, in the crime.

7.      Defendant Detectives consistently but falsely represented that an eyewitness account was the original source of the identifications of Mr. Connor and Mr. Wagstaffe as suspects. But records intentionally withheld from the defense at the time of trial demonstrate that Police Defendants had begun targeting Mr. Connor before the purported eyewitness ever spoke to the police.  Though the circumstances of the crime and a minimally adequate investigation would have suggested to the police that Negron had been abducted and murdered by someone she knew, the detectives improperly focused on Mr. Connor from the day Negron's body was found and on Mr. Wagstaffe no later than the afternoon of the next day.  The detectives purposefully ignored the ample evidence of Mr. Connor and Mr. Wagstaffe's innocence and fabricated evidence to ensure their convictions.

8.      To implicate Mr. Connor in the crime, the detectives encouraged Brunilda Capella, a local heroin addict and prostitute who regularly acted as a police informant, to fabricate a statement that she saw Mr. Connor, Mr. Wagstaffe, and a third man abduct Negron in the early morning of January 1, 1992. Upon information and belief, at the time, Mr. Connor had been dealing

drugs in the neighborhood for approximately one year and was known to the detectives. The detectives fabricated or caused to be fabricated additional statements from other witnesses aimed at bolstering this false story and securing Mr. Connor and Mr. Wagstaffe's convictions. Though the detectives knew or should have known that these statements were false, they intentionally withheld that crucial and exculpatory information from prosecutors.

9.      The detectives also fabricated or caused to be fabricated the identification of two pieces of additional evidence: the car purportedly used in the kidnapping, and a headband purportedly belonging to the victim which was found in the car. In fact, the detectives knew that the car and the headband had no association with the crime, but they falsely represented that the identifications were reliable and that the evidence was relevant to the crime.

10.     The detectives buried and withheld any evidence that contradicted their made-up version of the crime by failing to document that evidence and/or failing to disclose it to the prosecutors or defense attorneys. For example, detectives failed to document or disclose a statement from the owner of the car allegedly used in the crime, which established that the car was double-parked and immovable in a parking area on the street near a church at the time of the crime. Detectives also failed to disclose that Capella, the prosecution's key witness, was a regular—and often unreliable—police informant. This impeachment evidence would have called a key part of witness Capella's false statements into question.

11.     These actions of the individual Police Defendants were the direct result of the conduct of supervisors, including Sergeant Michael Race, who was directly involved in the Negron investigation, and policymakers who condoned and facilitated the use of such unconstitutional practices.

12.     The detectives' misrepresentations concerning the truthfulness and reliability of the

witness statements, as well as their misrepresentations concerning the circumstances under which the headband and car were identified, led the prosecution to charge Mr. Connor and Mr. Wagstaffe with second degree murder and first degree kidnapping.

13.     Even with the Defendants' fabrications, however, the evidence at trial was so weak that the judge threw out the murder charge, refusing to submit it to the jury.  Nevertheless, though they were completely innocent and no physical evidence connected them to the crime, the misconduct ensured that Mr. Connor and Mr. Wagstaffe were both convicted of second degree kidnapping. Each received a sentence of twelve-and-one-half years to twenty-five years.

14.     DNA testing conducted sixteen years later confirmed that Mr. Connor and Mr. Wagstaffe had nothing to do with the crime. And in 2014, citing the alarming evidence of fraud and misconduct by NYPD detectives in this case, a New York appeals court vacated Mr. Connor and Mr. Wagstaffe's convictions and dismissed the indictments against them.

15.     Due to Defendants' misconduct, Everton Wagstaffe spent nearly twenty-three years in prison. He was twenty-three years old when he was arrested.  By the time he was released after the Appellate Division Second Department reversed the convictions and dismissed the indictments in September 2014, he was over forty-six years old. From the inception of his defense against the charges and throughout his years of incarceration, Everton Wagstaffe consistently and adamantly maintained his innocence, including to the parole board and in various court proceedings.

## JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

17.     Supplemental jurisdiction over Mr. Wagstaffe's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

18.    Plaintiff has complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Comptroller of the City of New York on December 15, 2014, within the time required by New York General Municipal Law Section 50-e.  More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

19.    At the request of the City of New York on July 9, 2015, Plaintiff Everton Wagstaffe submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

20.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the judicial district in which the claims arose.

## JURY DEMAND

21.    Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff requests a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

22.    Plaintiff Everton Wagstaffe is and was at all times relevant to this Complaint a resident of the State of New York and a Jamaican citizen.  He currently lives in Guilderland, New York.

23.    Defendant City of New York was and is a municipality that is a political subdivision of the State of New York, was the employer of the individual defendants, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD").

24.    Defendant Detective Sergeant Michael Race was at all times relevant to this Complaint a duly appointed and acting detective sergeant of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances,

6

regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

25.     Defendant Detective David Carbone was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

26.     Defendant Jeffrey Wright was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

27.     Defendant George Hohenstein was at all times relevant to this Complaint a duly appointed and acting Sergeant Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

28.     Defendant James Curran was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual

capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

29.     Defendant Mark Brooks was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

30.     Defendant Charles Hecker was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

31.     Defendant Duggan, first name unknown, was at all times relevant to this Complaint a duly appointed and acting Detective of the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York. He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

32.     Defendant Carrice Coles is, upon information and belief, a citizen and resident of the State of North Carolina.  At the time of the investigation of Jennifer Negron's death and the corresponding trial, Coles was a citizen and resident of the State of New York.  Her actions at issue in the Complaint took place within the State of New York.

33.     Defendant Detective John Doe #1, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #1," was at all times relevant to this Complaint a duly appointed and acting supervisor in the NYPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York.  He is entitled to indemnification under New York General Municipal Law Section 50-k and by contract. He is sued in his individual capacity.

34.     Defendants Does #2 through 10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designations "John Doe" and "Jane Doe," represent those officers, detectives, supervisors, and/or other agents and employees of the NYPD or the OCME, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of New York and the State of New York, who participated in the misconduct described herein.  They are entitled to indemnification under New York General Municipal Law Section 50-k and by contract.  They are sued in their individual capacities.

35.     Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does #1 through 10 are referred to collectively as "Police Defendants."

## FACTS

### Jennifer Negron and the Night of the Crime

36.     At the time of the crime, sixteen-year-old Jennifer Negron lived in apartment 1A on the first floor of 851 Hegeman Avenue in the East New York neighborhood of Brooklyn.  Her window looked out onto a narrow sidewalk. The street was easily visible.

37.     Negron lived with her mother, Elsie Jimenez, her friend Carrice Coles, and various relatives.  According to Brunilda Capella, the informant whose false testimony caused Mr. Connor and Mr. Wagstaffe's convictions, Capella occasionally stayed at the apartment. Negron's aunt Margie Rivera lived in a separate apartment on the second floor of the same building. Capella testified at trial that the victim was "like family" to her and that they lived in the same building.

38.     In the early morning of January 1, 1992, Negron was in her Aunt Margie Rivera's apartment with Carrice Coles and various family members and friends.

39.     Negron's mother, Elsie Jimenez had gone to the hospital in late December of 1991 and remained there until January 1, 1992.  Upon information and belief, Jimenez struggled with drug addiction, owed money for drugs, and had checked herself into the hospital to avoid a confrontation with her drug dealer about her debt.

40.     After midnight, Negron and Coles left the apartment to walk around the neighborhood and look for a party. They met friends, briefly attended a party, and continued to walk around the neighborhood.

41.     Upon information and belief, at some point thereafter, around 2:00 a.m., Reggie Connor honked the horn of the blue Chrysler New Yorker he was driving and pulled over to speak with the girls, one of whom—Wanda Faison—he knew.  After speaking briefly with them, Mr. Connor got back in his car and drove off, and the girls continued walking.  Mr. Connor was alone

in the car.

42.     According to Coles, she and Negron walked Wanda to her home and then returned to their home.  Also according to Coles's account, they left the apartment once more that night, but they were back by 3:00 a.m., where Coles and one of Negron's sisters went to sleep and Negron stayed up.

### The Crime

43.     Sometime after 3:00 a.m., Jennifer Negron left or was taken from her apartment building.  She was beaten, strangled, and stabbed, and her body was dumped from a vehicle onto a street corner roughly a mile from her home.  Around three hours later, her body was found face down in the street.  She was nude from the waist down and her denim top was covered in blood.

44.     Because the sidewalk in front of her apartment window was well-lit, and because the street was just feet away from the apartment windows, Negron would have been able to see and identify any visitor on the sidewalk or street outside the building.  Thus, the evidence strongly suggested that Negron knew the person she left the apartment to meet.  Indeed, there were no signs of forced entry and the multiple other people in the apartment had not even heard her leave.  The detectives intentionally ignored this evidence because it did not comport with the version of the crime that they had fabricated.

45.     There were tire tracks in the dirt beside Negron's body.  Because of the tracks and lack of blood around the area, the detectives concluded that the murder likely took place elsewhere, and that the body was dumped from a vehicle onto the street corner.

46.     The medical examiner concluded that Negron had died from being strangled and stabbed.  According to the medical examiner's report, she had four stab wounds to her neck and head, and there were a series of small cuts on her hands and between her fingers.  A bone in her

neck was fractured, and she was freshly missing two teeth.  There were also two small abrasions near her anal opening.

47.    A rape kit was prepared, including vaginal, anal, and oral swabs taken by the examiners.  Those samples were destroyed roughly two weeks after the crime.  A number of foreign hairs were recovered from her body, including numerous hairs recovered from pubic combings and the surface of her body.

**Everton Wagstaffe's 1991 New Years Eve Celebration and His and Reggie Connor's Whereabouts**

48.    Everton Wagstaffe—who had no connection to Jennifer Negron—had spent the late evening of December 31, 1991 and the entire morning of January 1, 1992 at an apartment in Farmingdale, Long Island where he and Joanne Butler, his girlfriend with whom he was living in 1991-1992, hosted a New Year's Eve party for friends.

49.    Upon information and belief, sometime after midnight on December 31, 1991 in the early morning of January 1, 1992, Reggie Connor was at his parents' house with his girlfriend and son.  While his girlfriend and son stayed at his parents' house, Mr. Connor borrowed a friend's blue Chrysler New Yorker and drove to pick up money from his associates in the drug trade.

50.    Upon information and belief, while he was out, Mr. Connor pulled over and briefly spoke to the group that included Jennifer Negron and her friend Wanda, whom Mr. Connor knew. After a few minutes, the girls and Mr. Connor went their separate ways, and Mr. Connor stopped at a nearby store and then drove back to his parents' house.

51.    Upon information and belief, at no point during this trip did Mr. Connor have any other passengers in the blue Chrysler.

52.    Everton Wagstaffe was completely innocent of and had nothing to do with Jennifer Negron's kidnapping and murder.  He did not know that she had died until after he was arrested

for the crime on January 8, 1992. He was not in a car with Connor at any time on New Year's Eve or New Year's morning on January 1, 1992 or on any other occasion. He had no association or connection with Reggie Connor.

## INVESTIGATION AND FABRICATION OF EVIDENCE

### Initial Investigation

53.     At approximately 2:00 p.m. on January 1, 1992, Negron's aunt Margie Rivera went to the police station and filed a missing persons report. Defendant Officer Duggan, who prepared the missing persons report, realized that Rivera's description of her niece matched a homicide victim whose body had been found earlier that morning. That case, the first homicide of the new year in the 75th Precinct, was labeled Homicide 1, or "Hom 1."

54.     Defendant Detective Wright caught the case. Later that day, Wright spoke to Margie Rivera, Carrice Coles, and Negron's boyfriend Errol Wade, who identified the Homicide 1 victim as Jennifer Negron.

55.     Also on January 1, 1992, Wright canvassed Negron's apartment building. Two potential leads emerged from these interviews. First, Lydia Valdez reported hearing a struggle outside the apartment building around 3:30 a.m. Second, Mayra Rodriguez reported seeing three unfamiliar males in the lobby of the building around 4:45 a.m. The apartment building is relatively small, consisting of only three floors, and many occupants knew each other. Rodriguez told Defendant Detective Jeffrey Wright that two of the males were black, and that one might have been Hispanic.

56.     On January 1, 1992, Defendant Detective David Carbone submitted a "Request for Records Check" form to the NYPD photo unit, seeking four photographs of Reggie Connor. Carbone listed Mr. Connor's birth date, address, and unique New York ID number on the form,

which was signed and authorized by Defendant Sergeant Michael Race.  The form reflects that the request was associated with Negron's murder investigation, "Hom 1."

57.     The next day, on January 2, 1992, detectives continued to focus on Mr. Connor. At least three requests for information on Mr. Connor were made no later than the early afternoon of January 2, 1992.  Officers received two responses to requests sent through the NYPD "Finest Message Switching System" at 2:48 p.m. and 2:53 p.m., and Mr. Connor's arrest record was searched at 3:07 p.m.  At 6:05 p.m. that day, before Mr. Wagstaffe was identified by Capella, officers received a response to a Finest Message Switching System request regarding Mr. Wagstaffe.

58.     Later that afternoon, Elsie Jimenez, Margie Rivera, and Brunilda Capella went to the 75th Precinct.  Elsie Jimenez identified the body as her daughter Jennifer Negron.

### Fabrication of a False Statement from Brunilda Capella

59.     While Brunilda Capella, a regular police informant, was at the 75th Precinct purportedly after 4:00 p.m. on January 2, 1992, Police Defendants spoke to her about the crime. Wanting to implicate Reggie Connor in the crime but lacking any evidence against him, Police Defendants fed her the name "Reggie" and used undue suggestion and/or coercion to elicit a statement from Capella implicating Mr. Connor in the crime.  Upon information and belief, Police Defendants promised favorable treatment and/or leniency to Capella in exchange for this false statement. Police Defendants subsequently falsely represented that they first heard the name "Reggie" in connection with the crime when Capella volunteered it to them on January 2, 1992. These fabrications and false representations were contained in police reports, communicated to the prosecution, and testified to before the grand jury and at trial.

60.     Capella was known to the police at the time.  She was a heroin addict who, by her

own admission, would use as much heroin as she could obtain.  Capella was rarely if ever not under the influence of drugs.  She paid for her addiction and supported herself with prostitution and the occasional sale of drugs and drug paraphernalia.

61.    Capella had provided information, much of which was unreliable, about crimes to the police on multiple occasions and over a number of years, beginning at the latest in 1987.  From 1987 to 1989, Capella acted as an unregistered informant for Defendant Mark Brooks, who was one of the officers who responded to the street corner in East New York where Negron's body was found.  Defendant Brooks and his partners regularly received tips from Capella.  Upon information and belief, Capella was not arrested or prosecuted in the years during which she acted as an informant; by her own admission, she committed numerous crimes during this time.

62.    Defendant Brooks worked on the 75th Precinct's robbery squad at the time of Negron's murder, where he was supervised by Defendant Michael Race.  Brooks joined the detective squad a few weeks after Negron's murder.

63.    Defendants Detective Wright and Detective Curran, acting alone or in concert with other Police Defendants, fed Capella information consistent with how the detectives then believed the crime had transpired.  Based on his interviews with Lydia Valdez and Mayra Rodriguez, Defendant Detective Wright had reason to believe that Negron was abducted around 3:30 a.m. by three men, at least two of whom were black.  Additionally, the detectives in the 75th Precinct were already focused on Reggie Connor, having ordered four pictures of him on January 1st and requested multiple reports on Connor before Capella arrived at the police precinct.

64.    Based on the information fed to her by Police Defendants, including without limitation Wright and Curran, Brunilda Capella fabricated the story that she saw a man in the passenger seat of a car, which contained three men and was driven by a man named Reggie, pull

Negron into a car in front of 851 Hegeman Avenue around 3:30 a.m. on the morning of January 1, 1992.  Capella falsely added the detail, also consistent with the detectives' belief at the time, that the man in the passenger's seat was black. In fact, Capella stated that she had interacted with this man on a few prior occasions and called him by her own unique nickname that was not used by anyone else: "Black." She subsequently identified Everton Wagstaffe as "Black."

65.     Prior to their arrests, Mr. Connor and Mr. Wagstaffe did not know each other.

66.     Sometime after 4:00 p.m. on January 2, 1992, the detectives showed Capella a photograph of Reggie Connor, who she identified.

67.     At the time, detectives in the 75th Precinct knew of Everton Wagstaffe as someone who had been dealing drugs within the Precinct.

68.     At 6:05 p.m. on January 2, 1992, a detective in the 75th Precinct received a response to an earlier request sent through the NYPD "Finest Message Switching System" regarding Everton Wagstaffe.   Thereafter, Defendant Detective Wright provided Capella with books containing photographs of young black men.  Capella pointed to a picture of Everton Wagstaffe and identified him as "Black."

69.     Around 10:30 p.m. on January 2, 1992, Defendant Detective James Curran memorialized Capella's false statement in a police report.  In that report, he falsely represented that Capella had volunteered the name "Reggie" and intentionally omitted the circumstances of the statement, namely that the detectives had used suggestion, pressure, coercion, or other illegal tactics to induce Capella to make the false statement, which the officers knew to be false.

70.     The Police Defendants, including without limitation Detectives Wright and Curran, knew that Capella's statement, which they had helped her fabricate, was false.   Nevertheless, Detective Wright failed to disclose this information to District Attorney Marie Bukamire while

Wright was present during the audio recording of Capella's statement, at 8:05 p.m. on January 3, 1992.  Police Defendants also failed to disclose this information thereafter to the prosecuting Assistant District Attorney, Anne Gutmann.

### Fabrication of Evidence from Brunilda Capella and Carrice Coles

71.     Upon information and belief, on the night of the crime, Reggie was driving a blue Chrysler New Yorker.  He was alone in the car at all times.

72.     However, the Police Defendants, including without limitation Detective James Curran, used impermissible suggestion and/or pressure and/or coercion to induce Brunilda Capella into falsely identifying a brown 1983 Buick Skylark as the vehicle used in the crime. Police Defendants then used impermissible suggestion and/or pressure and/or coercion to induce Carrice Coles into falsely identifying a brown 1983 Buick Skylark as the vehicle driven by Mr. Connor on the night of the crime.  These fabrications and false representations were contained in police reports, communicated to the prosecution, and testified to before the grand jury and at trial.

73.     The Police Defendants used impermissible suggestion and/or pressure and/or coercion to induce Capella into falsely identifying a brown 1983 Buick Skylark as the vehicle used in Negron's abduction.  But due to her history as an informant, her status as a prostitute, and her heroin abuse, including on the night of the crime, it would have been clear to the Police Defendants that Capella was not a credible witness.  She would not have been credible at the time of her statement, and the detectives knew or should have known that her credibility would be vulnerable during a jury trial.

74.     Accordingly, the Police Defendants, wanting to secure Mr. Connor and Mr. Wagstaffe's convictions for the crime, used improper suggestion and/or coercion to cause Carrice Coles to make statements consistent with those given by Brunilda Capella in order to bolster

Capella's fabricated version of the crime.

75.     Specifically, Police Defendants used impermissible suggestion and/or pressure and/or coercion to induce Carrice Coles into stating that, when she had seen Reggie Connor earlier during the night of the crime, there were two other unidentified males in the car with him, and he was driving a brown 1983 Buick Skylark.  This was false.  Upon information and belief, Mr. Connor had been alone in the car when he stopped to say hello to Coles, Faison, and Negron before returning home for the night.  Additionally, Reggie had been driving a blue Chrysler New Yorker. Coles had initially told Defendant Detective Curran that Mr. Connor had been driving a blue or gray car.

76.     The brown Buick Skylark that Capella and Coles falsely identified as the car used in Negron's abduction and driven by Mr. Connor on the night of the crime actually belonged to Betty Bonner, a middle-aged woman who did not know either Reggie Connor or Everton Wagstaffe.  Betty Bonner had a son, Corey Bonner, who was close in age to Mr.  Connor and Mr. Wagstaffe.  Neither Mr. Connor nor Mr. Wagstaffe knew Corey Bonner.

77.     Upon information and belief, the detectives had begun targeting Corey Bonner as Mr. Connor and Mr. Wagstaffe's accomplice before Capella identified the Bonner car as the one used in the crime.  Records initially withheld from trial and appellate counsel and disclosed to post-conviction counsel for the first time in January 2010 reveal that the detectives submitted a "Request for Records Check" on Corey Bonner dated January 2, 1992.  However, the police file indicates that the detectives did not run the license plate of the car identified by Capella, and thus did not receive the name "Betty Bonner" until January 3, 1992, as to which a "Finest Message Switching System" report was generated at 10:40 a.m. on that date.

**The Bonner Car**

78.    On January 3, 1992, Detective James Curran sought a warrant to search the Bonner's brown Buick Skylark and seize any property within it that might be related to the investigation.  In his affidavit, Curran swore that Brunilda Capella identified the car as the one used in the crime.  At the time, Curran knew that the identification was false and/or fabricated. He omitted that Carrice Coles had also allegedly identified the car as the one driven by Reggie Connor.

79.    Defendant Detective Curran, alone or accompanied by other Police Defendants, also spoke with Betty Bonner at some point after her car was towed away from her parking lot.

80.    From their conversation with Betty Bonner, Police Defendants learned that Betty Bonner's brown Buick Skylark could not have been used in the commission of Negron's kidnapping or murder.

81.    Betty Bonner told the detectives where her car had been at the time of the crime. Specifically, Bonner told the detectives that, at approximately 8:00 p.m. on December 31, 1991, she had gotten into the brown Buick Skylark to drive to church with her four daughters, who ranged in age from sixteen years old to twenty-seven years old.  On the way to the church, she picked up her mother, Annie Bonner-Silar.  The family drove to the Holy Spirit Church of God in Christ, located at 317 Rockaway Avenue in Brooklyn, arriving around 9:00 p.m. and parked the car outside the church.

82.    Betty Bonner told Police Defendants that when she left the church at about 9:30 p.m. to get a cup of coffee from a nearby store, she observed that the area surrounding the church had already filled up with cars, such that her car was blocked by other cars and could not be moved.

83.    Betty Bonner told Police Defendants that the family stayed at the church until the next morning, celebrating the church's overnight New Year's service, also known as a "Watch

Night," where the congregation gathers to watch the new year come in.  When the service was over, Betty Bonner unlocked the Skylark—which showed no signs of damage—with her key.  She and her family eventually returned home around 4:30 a.m. or 5:30 a.m. on January 1, 1992.

84.     During the same conversation in which Betty Bonner told the Police Defendants about the true location of the car on the night of the crime, Police Defendants questioned her about her son Corey Bonner.  In response to their questions regarding whether Corey could have taken the car that night, Betty Bonner told Police Defendants that Corey had been living in Philadelphia, and that he did not even have a license and could not drive.  Indeed, Corey Bonner suffers from chronic illness and has never driven a car.

85.     By the end of the Police Defendants' conversation with Betty Bonner, the Police Defendants knew that neither her Buick Skylark nor her son Corey Bonner had any connection to Negron's kidnapping and murder.

### Suppression of Evidence

86.     Though clearly material and exculpatory, the Police Defendants' conversation with Betty Bonner regarding the brown Buick Skylark and Corey Bonner's whereabouts was never documented in a police report or otherwise.  It was not disclosed to the defense at any point before or during trial.

87.     Indeed, Betty Bonner's exculpatory information was not discovered by anyone outside of the 75th Precinct until 1998, when Betty Bonner was located by Reginald Connor's appellate defense counsel.

88.     Though Capella routinely acted as an informant for at least one officer in the 75th Precinct, and though this information was often unreliable, Police Defendants hid this fact.

89.     If the defense had known of Capella's history as a police informant at trial, it would

have undermined Capella's testimony that she was afraid to talk to the police immediately after allegedly witnessing Negron's kidnapping.

90.     Throughout the investigation and trial, Defendant Detective Jeffrey Wright, Defendant Detective James Curran, and others falsely represented to the prosecutors, to the defense attorneys, in police reports, and in their sworn trial testimony that Capella alone first identified Reginald Connor.  They falsely represented that they had not heard the name "Reggie" in connection with the crime before Capella, uninfluenced by any other person or source, volunteered it. And these Police Defendants withheld and failed to disclose the circumstances of Capella's statement, namely Police Defendants' own coercive and/or suggestive tactics in eliciting the statement.  Those false representations were crucial to the Police Defendants' effort to falsely support the credibility of Capella's identifications of Wagstaffe and Connor.

91.     Police records indicate that the detectives had collected information on Reggie Connor at least four times before Capella arrived at the police precinct on January 2, 1992: Detectives requested four photographs of Reggie on January 1st, and they received three reports pertaining to Reggie before Capella went to the station after 4:00 p.m. on January 2nd.  Moreover, police records indicate that the detectives were focused on collecting information about Everton Wagstaffe before Capella purportedly identified his photograph at the station around 6:30 p.m. on January 2nd.

92.     At trial, according to the false police testimony, it was only after Capella told the detectives that the driver of the car which purportedly was involved in the abduction of Jennifer Negron was a person Capella knew as "Reggie," and only after Capella took detectives to Connor's address late in the day on January 2nd, and only after police then searched the reverse "Coles directory", that they learned that "Reggie" was Reginald Connor.

93.     That false testimony was central and crucial to the detectives' effort to support the credibility of Capella's false identifications of Wagstaffe and Connor.

94.     That testimony was specifically fabricated to support (a) Capella's purported personal knowledge of "Reggie" and therefore her credibility in identifying him as the driver of the car in the kidnapping she supposedly witnessed; (b) her credibility in identifying Wagstaffe from the mugshot photo book as the person who supposedly pulled Negron into the car; and (c) her credibility in identifying the car belonging to Betty Bonner as the purported kidnap car. If the defense had known of those false representations at trial and had known that the police had actually fed the purported identifications of Wagstaffe and Connor to Capella, Capella's credibility and her identifications of Wagstaffe and Connor and the Bonner car would have been clearly unreliable and unbelievable.

95.     The Police Defendants falsely represented and concealed, and have continued to this day to falsely represent and conceal, their actual reasons for focusing on Connor and Wagstaffe and the Bonner car before Capella's information purportedly led them to those identifications.

96.     The Appellate Division specifically found that "[t]he documents call into question whether Capella provided the detectives with the identities of the defendants or if the detectives, without an evidentiary basis, had identified Connor and Wagstaffe prior to Capella's identification of them, thus bearing negatively upon the credibility of Capella and the investigating detectives." *People v. Wagstaffe and Connor*, 120 A.D.3d 1361, 1365 (2d Dept., 2014).

### Physical Evidence and Forensic Testing

97.     Pursuant to a search warrant, police searched Betty Bonner's car on January 3, 1992.  Numerous items were seized from the Bonner car, including:

      a.   Hair and/or fibers from the front seat, left rear floor, right rear floor, and front

      console area;

b.   Fingerprints recovered from four locations in the car: the passenger's side front door window glass, driver's side front door window frame, an interior rear view mirror, and another interior rear view mirror;

c.   Five different hair accessories, including: (1) two black hairpins; (2) a blond hair braid; (3) an elastic hair barrette with white plastic balls; (4) a blue stone yellow metal earring; and (5) a black hair band;

d.   A Lorus watch face made of white metal; and

e.   A pair of blood-stained work gloves.

98.    All of the evidence listed above was given to Defendant Detective Jeffrey Wright for vouchering.

99.    On January 4, 1992, Defendant Detective Jeffrey Wright vouchered four of the five hair accessories found in the car together.  He did not voucher the "black hair band," referred to during trial as a "black headband," with the other hair accessories.

100.    On that same day, Defendant Detective Jeffrey Wright submitted a number of the hair accessories to the police laboratory for forensic testing. He did not submit the black headband for testing.

101.    Of all the physical and forensic evidence found in the Bonner vehicle, the black headband is the only piece that was never tested.  Records suggest that the headband was prematurely destroyed by the Property Clerk Division of the NYPD on May 17, 1995.

102.    Of all the physical and forensic evidence found in the Bonner vehicle, the black headband was also the only piece of hair accessory evidence admitted at trial, when witnesses falsely testified that it matched a black headband worn by Jennifer Negron.

103.    Though all evidence except the headband was tested, no forensic testing—including blood matching, hair comparison, and fingerprint comparison—linked Reggie Connor, Everton Wagstaffe, or the victim to the Bonner's Buick Skylark.  This is because the car is in no way related to the kidnapping and murder of Jennifer Negron.

104.    When Betty Bonner had the opportunity to view photographs of the hair accessories recovered from the car, she identified all of the items as belonging to her or her daughters.  She specifically recalled that her daughter Wanda, now deceased, would often wear the blond braid in her hair.

105.    Despite this significant evidence that the Bonner car was in no way related to the crime, and despite their failure to produce any physical evidence that tied Mr. Connor or Mr. Wagstaffe to Negron, Police Defendants continued to focus the investigation solely on them.

### An Intentionally Inadequate Investigation

106.    In addition to the activities described above, including burying, obscuring or ignoring evidence tending to exculpate Mr. Connor and Mr. Wagstaffe, the detectives intentionally conducted an inadequate investigation of Jennifer Negron's murder so as to not uncover further evidence of their innocence, and because the detectives were not actually trying to find the true perpetrator.  Rather, they were intent on pursuing the false charges against Wagstaffe and Connor to quickly close the case.

107.    While the detectives ordered forensic testing on numerous pieces of physical evidence, including a number of hair accessories, they intentionally failed to order forensic testing on the single piece of physical evidence that they used to tie Jennifer Negron to Betty Bonner's car: the nondescript black headband.

108.    Though the false statements from witnesses Capella and Coles indicated that three

men abducted Jennifer Negron, as had the statement from Mayra Rodriguez, the detectives made no attempt to identify the supposed third perpetrator after Corey Bonner's strong alibi made it impossible for the detectives to falsely implicate him in the crime. The detectives never questioned Mr. Connor or Mr. Wagstaffe about the identity of the purported third perpetrator because they knew that Capella's statement was false.

109.   Though the crime was violent and the victim was found covered in blood and missing teeth and clothing, and though Mr. Connor and Mr. Wagstaffe were identified as suspects very soon after the crime, the detectives never sought to search Mr. Connor or Mr. Wagstaffe's residences or vehicles for physical evidence such as traces of blood, the victim's clothing, or the victim's teeth. Though the victim had been stabbed repeatedly, the detectives never searched Mr. Connor or Mr. Wagstaffe's residences or cars for the murder weapon. Because they knew Mr. Connor or Mr. Wagstaffe's were innocent, Police Defendants knew such searches would be fruitless.

110.   When Mr. Wagstaffe was arrested, the white Jeep that he had been driving was unlawfully seized and retained by the police detectives. Undisclosed to Mr. Wagstaffe and Mr. Connor, the detectives may have searched that white Jeep, found no evidence of the crime and failed to submit the related required police report.

111.   The detectives never tried to uncover a connection between Mr. Connor and Mr. Wagstaffe, who did not know each other before they were both falsely accused of Negron's murder. The detectives also never tried to uncover a connection between the criminal defendants and the victim or a motive for the killing. This is because they knew that no such motive or connection existed, as Mr. Connor and Mr. Wagstaffe had no involvement in the crime.

112.   The detectives did not try to link Betty Bonner's car to the tire tracks left next to

Jennifer Negron's body, as they knew that the Bonner car was not actually used in the crime, and thus that the tire tracks would not match.

113.    As the detectives were not trying to find the true perpetrator, the detectives failed to speak with Jennifer Negron's close friends or classmates, despite the ample evidence that she knew her killer.

114.    When Mayra Rodriguez was shown photographs of Mr. Connor, Mr. Wagstaffe, and Corey Bonner on January 4, 1992, and told Police Defendants that they were not the three men she had seen in the lobby on the night of the crime, Police Defendants intentionally ignored this evidence that the real perpetrators remained at large.

115.    Upon information and belief, one individual said that Brunilda Capella, who is now deceased, admitted that she was lying about seeing Mr. Connor and Mr. Wagstaffe commit the crime; and another individual said Ms. Capella told him she did not intend to testify against them at trial.

116.    Upon information and belief, if the detectives had conducted a minimally adequate investigation by speaking with neighbors and those close to the victim's family, they would have discovered that it was common knowledge, at least among persons living at her residence building, that Elsie Jimenez owed money to her drug dealer, a young man who was friendly with her daughter Jennifer Negron. Upon information and belief, the detectives would have further discovered evidence that Jimenez had heard that her drug dealer was upset and looking for her around the time of the crime, so she checked herself into the hospital in order to avoid a potentially violent confrontation.   However, as the detectives did not conduct a minimally adequate investigation, this evidence did not emerge until the post-conviction investigation regarding Mr. Connor and Mr. Wagstaffe's convictions.

**Sergeant Michael Race Supervised and was Directly Involved in
the Investigation of Negron's Death**

117.    Sergeant Michael Race played an active role in the investigation of the Negron murder from start to finish.  For example, Race signed off on at least 25 police reports that detail each stage of investigation, including a report of the first officer at the scene, reports detailing Capella's and Coles's purported identifications of suspects and evidence, and reports dated after Mr. Connor and Mr. Wagstaffe were apprehended. Race also spoke with multiple individuals about Mr. Connor's whereabouts and personally visited an East New York housing project in an attempt to apprehend Mr. Connor.  Additionally, Race served Capella with a subpoena instructing her to testify before the grand jury in Mr. Connor and Mr. Wagstaffe's case and accompanied her to the grand jury.

118.    Upon information and belief, another supervisor, Doe #1, also supervised the investigation.

**The 75th Precinct**

119.    At the time of the crime, Michael Race was a Sergeant in the NYPD's 75th Precinct, where he oversaw hundreds of murder investigations, including the investigation of Jennifer Negron's murder.

120.    In 1992, the arrest of the 75th Precinct's officer Michael Dowd and revelation of the extent of the precinct's corruption and misconduct left the NYPD reeling and significantly damaged the public's trust in its officers.  However, at the time of Jennifer Negron's murder and its investigation, the now-notorious corruption and misconduct of 75th Precinct's officers was continuing unchecked, still hidden from public view.

121.    Over the course of many years, Dowd and a gang of other poorly supervised officers from the 75th Precinct had been making thousands of dollars a week by robbing drug dealers,

charging criminals with protection taxes, and dealing drugs in the East New York neighborhood they were supposed to protect.  Dowd's arrest led to the creation of the Mollen Commission to investigate corruption in the NYPD.

122.    The Mollen Commission's Report concluded that corruption and misconduct in the NYPD were the result of a system that fostered malfeasance.  Supervisors willfully failed to ensure the honesty of NYPD officers, often due to the fear that exposing corruption could damage their own reputations.  This discouragement of accountability was palpable to more junior officers, who adhered to a "code of silence" and systematically failed to report the misconduct of their peers.  Upon information and belief, this behavior and attitude were common in the detective division of the 75th Precinct.

123.    At the time of Negron's murder, the 75th Precinct had one of the highest murder rates in the country.  One year later, in 1993, it set a new record for a New York City precinct, with 129 killings that year.  As the 75th Precinct's Sergeant Michael Race has since noted, the detective squad was overwhelmed by the sheer number of murder investigations it was charged with conducting.

124.    Race has conceded that his detectives cut corners, telling the New York Times that, of the 750 murder investigations he oversaw, only one was done correctly.

125.    Cases overseen by Race during this time were later investigated by the Detective Bureau Special Investigations Unit because of Race's suspiciously high rate of cases marked "exceptional clearance."  Exceptional clearance is a term that refers to cases that are closed because the suspect is already deceased, already serving life in prison, or otherwise seriously unavailable.  Race's exceptionally high rate prompted the investigation of various cases he closed between 1989 and 1991, though no finding of wrongdoing was ultimately made.

126.     Former colleagues have since spoken up about Race's misconduct, explaining that he was motivated to be known as having a high rate of closing cases, and that he had a reputation for feeding informants and witnesses details about crime.

127.     The misconduct of 75th Precinct officers and detectives at this time led to several other known wrongful convictions, including that of Jeffrey Blake, who spent nearly eight years in prison due to similar misconduct by Defendants Race and Carbone, and Timothy Crosby, who spent nearly twelve years in prison.

128.     Indeed, the misconduct and unlawful tactics that led to Reggie Connor and Everton Wagstaffe's wrongful convictions were common in the 75th Precinct at the time of the Negron investigation. These tactics included, but were not limited to: repeated use of clearly incredible informants; misrepresenting that statements fabricated by officers actually originated with informants themselves; using suggestion and/or coercion to induce witnesses to create fabricated accounts of a crime; feeding witnesses and informants facts to bolster their accounts; and the suppression of evidence that suggests the suspects' innocence, points towards the true perpetrator, or would expose the NYPD's misconduct. But for Defendants' misconduct, Everton Wagstaffe would not have been convicted of a crime that he did not commit, and Jennifer Negron's true killer might have been found.

**THE PROSECUTION**

129.     Everton Wagstaffe was falsely arrested by the police in Brooklyn on January 8, 1992 in connection with the Negron murder and kidnapping. He told the police that he was completely innocent of the crime. After Eveton Wagstaffe was arrested, he was brought to the 75th Precinct, where Brunilda Capella selected him out of a line-up, again falsely claiming that she had seen him kidnap Jennifer Negron. This line-up, during which Defendants Sergeant Hohenstein

and Detective Wright were present, was tainted by Capella's prior false identification of Mr. Wagstaffe's photograph, and was also the product of impermissible suggestion and/or coercion.

130.    Reggie Connor and Everton Wagstaffe were charged with second degree murder and first degree kidnapping.

### The Trial

131.    Mr. Connor and Mr. Wagstaffe's joint jury trial for murder and kidnapping began on January 14, 1993 and lasted through January 27, 1993.

132.    The evidence in the case was so weak that the judge refused to submit the murder charge to the jury.  She submitted two alternative charges to the jury: one count of kidnapping in the first degree, and one count of kidnapping in the second degree.

133.    The jury convicted Mr. Connor and Mr. Wagstaffe of second degree kidnapping, the least serious of the crimes charged.

134.    Though there was an abundance of physical evidence in the case—including tire tracks, fingerprints, blood, and hair evidence—no physical evidence has ever connected Mr. Connor or Mr. Wagstaffe to the crime.   At trial, the only direct link between the criminal defendants and the crime was testimony from Brunilda Capella.

135.    After Capella repeatedly failed to appear to testify at trial, the police went to great lengths to secure her presence.  After she missed the first several days of trial and initially could not be located, police found her high on heroin and in possession of a crack pipe.  They requested that a judge remand Capella into their custody, and they brought her into a hospital to receive medication for withdrawal.  Capella was discharged from the hospital, where she had spent three days being treated for withdrawal, on the morning of the day she testified in court.  By her own admission, Capella was still experiencing withdrawal symptoms while she testified in the trial.

136.    At trial, Capella claimed that she saw Mr. Wagstaffe violently abduct Negron from the sidewalk in front of her apartment building by pulling her into a car that Mr. Connor was driving.  She falsely identified the car as Betty Bonner's brown Buick Skylark.

137.    Although Capella was very close with Negron's family and often lived with them, she claimed that—instead of calling the police or reporting the abduction to the victim's family— she turned and walked to her aunt's house, where she stayed without mentioning the crime to anyone until the day after Negron's body was found.

138.    On cross examination, Capella explained that she was too afraid to go to the police with a tip—an explanation that the jury apparently accepted.  However, unbeknownst to the defense but known by the Police Defendants, Capella had frequently gone to the police claiming to have witnessed crimes.  Though unregistered, Capella acted as an informant for at least one officer in the 75th precinct and had provided unreliable information on many occasions over the course of multiple years.  The detectives intentionally withheld this critical impeachment evidence from the prosecution and defense attorneys in order to secure Mr. Connor and Mr. Wagstaffe's convictions.

139.    Carrice Coles also testified at trial.  She told the jury that she and Jennifer Negron had seen Reggie Connor on the night of the crime when he got out of his car to greet them as Coles and Negron were walking around the neighborhood.  Coles falsely testified that there were two other individuals in the car with Mr. Connor, and she falsely identified a photograph of the Bonner car as the car Mr. Connor was driving that night.

140.    Aside from the testimony of Capella and Coles, the other piece of evidence at trial was the black headband (also called a hair band) found in the Bonner car.  Though the ample forensic evidence recovered from the car failed to link Negron to the car despite the violent, bloody

struggle that had supposedly taken place, the prosecution attempted to use the headband to place Negron in the car.  This was possible because Police Defendants had never, for reasons that were never explained, submitted the headband to a laboratory for testing.

141.    The black headband was unremarkable and common, but at trial Elsie Jimenez, Margie Rivera, and Carrice Coles testified that the headband matched one worn by Negron.  Rivera initially falsely testified that the stain on the headband in evidence matched the stain on Negron's headband—which Rivera had given her.  However, she conceded on cross-examination that the headband was in a very different condition than the one she had given to Negron.

142.    Upon information and belief, Police Defendants used improper suggestion, pressure, or coercion to induce Jimenez, Rivera, and Coles into making statements linking Negron to the headband found in the Bonner car.

143.    Betty Bonner and her four daughters all wore headbands.  She thought they looked nice, so she wore one herself and encouraged all of her daughters to wear them.  The Bonner family had similar headbands in many colors, including black.  At the CPL § 440 hearing, Betty Bonner identified the headband as having belonged to one of her daughters.  However, the jury never heard from Betty Bonner about the headband in question.

144.    Because the Police Defendants suppressed Betty Bonner's statement regarding the true whereabouts of her brown Buick Skylark on the night of the crime, the jury also did not hear this information, which would have undermined the prosecution's entire theory of how the crime transpired.

145.    The jury convicted Mr. Connor and Mr. Wagstaffe of second degree kidnapping. They were each sentenced to terms of twelve-and-one-half years to twenty-five years in prison.

## THE EXONERATIONS

146.    Reggie Connor appealed his conviction to the New York State Supreme Court, Appellate Division, Second Department.  That court affirmed his conviction on September 18, 1995.  The New York Court of Appeals denied Mr. Connor's application for leave to appeal on August 20, 1996.

147.    Everton Wagstaffe's conviction was also affirmed on September 18, 1995, and his application for leave to appeal was denied on August 20, 1996.  Mr. Wagstaffe filed an application for a writ of error coram nobis to vacate the appellate court's decision, but that application was denied on October 18, 1999.  Leave to appeal that decision was denied on November 24, 1999.

148.    Everton Wagstaffe subsequently filed a Notice of Motion to Vacate Conviction in the New York Supreme Court, pursuant to C.P.L §440.10, which Mr. Connor joined on June 11, 2010.  Mr. Wagstaffe and Mr. Connor asserted that their trial counsel were ineffective in not seeking information about the Bonner car; that the prosecution's *Brady* obligations were violated when it failed to disclose Capella's informant status; that their convictions were obtained by police fraud and false representations and related *Brady* violations; that newly discovered evidence warranted a new trial; and that the totality of the evidence demonstrated their actual innocence.

149.    The Supreme Court held hearings on the *Brady* claim regarding Capella's having been an informant and the ineffective assistance of counsel claim relating to the Bonner car.

150.    The court initially denied the motion to vacate, but the decision was reversed by the appellate court.  The appellate court found that the prosecution had violated *Brady* by not timely disclosing the documentation of the NYPD's investigation of Reggie Connor and Everton Wagstaffe that preceded Capella's purported identifications of Connor and Wagstaffe as the perpetrators.  It also noted that these documents supported an inference that the convictions were

obtained by way of fraud and perjury, stating that the identification of Mr. Connor and Mr. Wagstaffe as suspects clearly did not originate with Capella through information she gave after 4:00 p.m. on January 2, 1992, as Defendant Detectives Wright and Curran had repeatedly represented in police reports to the District Attorney and defense attorneys, and the trial court. The Appellate Division vacated Mr. Wagstaffe and Mr. Connor's convictions and dismissed the indictments against them. *People v. Wagstaffe and Connor*, 120 A.D.3d at 1365.

### DNA Evidence Proves that Reggie Connor and Everton Wagstaffe Are Actually Innocent of the Crimes Charged

151.     Everton Wagstaffe first sought DNA testing of the forensic evidence in this case in 2004. The City initially claimed it could not locate the evidence, and the petition was denied.

152.     Much of the evidence was subsequently located, and on January 20, 2009, a laboratory conducted testing on six hairs and/or fibers found on the victim's body and excluded both Mr. Connor and Mr. Wagstaffe as the contributors of any of the hairs. The hairs tested included two foreign hairs from the victim's pubic combings—the appearances of which indicated that they came from two different people—and multiple hairs recovered from the surface of the victim's body.

153.     Additional testing was conducted on the hair DNA that excluded Errol Wade, a boyfriend of the victim's, and Corey Bonner, the NYPD's third suspect, as contributors of the hairs. The test excluding Bonner further undermines the prosecution's theory that Corey Bonner or his mother's car were involved in the crime and points to unrelated perpetrators.

154.     In addition to definitively not being the sources of the foreign hairs found on the victim's body or pubic combings, both Mr. Connor and Mr. Wagstaffe were excluded as being the source of the blood on the work gloves found in Betty Bonner's Buick Skylark.

155.     Beginning in 2004 and continuing for a number of years, appellate counsel tried to

obtain physical evidence to submit for DNA testing, knowing that DNA testing would exculpate both Mr. Connor and Mr. Wagstaffe, who had no involvement in the crime.  However, much of the evidence, including the oral swabs and smears, anal swabs and smears, vaginal swabs and smears, and the black headband were destroyed and could not be tested.  Other evidence, including the victim's shirt and bra, remains in NYPD custody but is purportedly lost and thus has not been made available for testing.  Upon information and belief, if additional physical evidence is located and submitted for DNA testing, that DNA testing will further exculpate Mr. Connor and Mr. Wagstaffe, and may point to the actual perpetrator or perpetrators.

### THE CITY OF NEW YORK HAD A POLICY, PRACTICE, OR CUSTOM OF MISCONDUCT IN HOMICIDE INVESTIGATIONS

156.   The City of New York, by and through its final policymakers, had in force and effect during the Negron murder investigation and for years beforehand, a policy, practice or custom of unconstitutional misconduct in homicide investigations, including in particular the use of plainly unreliable informants and/or the reliance on witness statements that law enforcement knew or should have known were false; the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false witness statements; the fabrication of inculpatory evidence, including physical evidence; the suppression of exculpatory and/or impeachment evidence; ignoring evidence, including forensic evidence, that suggests the innocence of law enforcement's suspects; and the intentional failure to conduct adequate investigations of crimes.  The investigation of Mr. Wagstaffe was conducted pursuant to each of these customs of misconduct, which were widespread in the 75th Precinct and throughout the NYPD.

157.   This policy, practice, or custom of extracting false statements from informants and/or witnesses involved the use of various techniques, including, without limitation: promising

leniency or threatening prosecution in order to induce the informant and/or witness to make a particular statement, and withholding this information from prosecutors and defense counsel; feeding the informant and/or witness facts about the crime, or about how the detectives believed the crime had been committed; suggesting to and/or instructing the informant and/or witness to identify a particular person as the culprit, whether from a line-up, from a photo array, or in the course of giving a statement; and seeking to bolster the credibility of an incredible witness by using coercion and/or suggestion to extract a similar statement from another witness.  Police Defendants used each of these tactics in manufacturing a case against Mr. Wagstaffe.

158.    Various cases demonstrate that this misconduct was pervasive within the 75th Precinct around the time of the investigation of Negron's murder. In particular:

a.    In 1991, Jeffrey Blake was wrongfully convicted of a 1990 double homicide that was investigated by 75th Precinct detectives, including Defendant Sergeant Race and Defendant Detective Carbone.  Blake was arrested, prosecuted, and convicted based on the testimony of Dana Garner, a clearly unreliable witness who purportedly claimed to have witnessed the killings even though he was out of the state at the time.  Garner told police that his girlfriend had also witnessed the crime, but, as in Mr. Connor and Mr. Wagstaffe's case, the detectives made no attempt to corroborate Garner's account by contacting his girlfriend.  This is particularly striking because, as in Mr. Connor and Mr. Wagstaffe's case, the informant's version of the crime was not consistent with the physical evidence put forth by law enforcement. Garner since admitted that Sergeant Race fed him non-public facts about the crime and pressured him into falsely implicating Blake in those murders.  Defendants Race and Carbone were present at the

lineup, during which they pressured Garner to select Blake by verbally encouraging him and motioning in Blake's direction.  Jeffrey Blake served nearly eight years in prison for the murders before being exonerated, and he subsequently settled a civil rights suit against the City.

b. Also in 1990, while the informant Dana Garner was at the 75th Precinct falsely implicating Jeffrey Blake in the double homicide, detectives began to question him about a different murder that had happened a few days earlier.  Though Garner initially told Sergeant Race that he did not know who committed the murder, Race fed him nonpublic facts about the crime and ultimately pressured him into implicating Ruben Ortega as the shooter.  As in Blake's case and Mr. Connor and Mr. Wagstaffe's case, the informant was pressured into identifying Ortega from a photo array and then from a lineup.  Due to the 75th Precinct's rampant use of illegal investigatory techniques, Ortega also served many years in prison based on false testimony from a clearly unreliable informant.

c. Incredibly, Dana Garner had already falsely accused a different man, Timothy Crosby, of his 1988 kidnapping.  Consistent with its practice of conducting inadequate investigations, the 75th Precinct investigated this crime and arrested Crosby based principally on Garner's word.  After the Blake and Ortega misconduct came to light, Garner admitted that he falsely implicated Crosby, and Crosby's conviction was vacated after he had spent nearly twelve years in prison for a crime he did not commit.

d. In 1989, Bernie Pollard was wrongly arrested, imprisoned, and charged with a murder he did not commit—a crime investigated by Defendant Sergeant Race,

Defendant Detective Carbone, and other 75th Precinct detectives. Like Mr. Connor and Mr. Wagstaffe, Pollard had been arrested previously and was known to the police at the time of the crime. He was implicated by two jailhouse snitches who later tried to recant, but were threatened with perjury if they went back on their false statements about Pollard. Carbone pressured another witness to select Pollard from a lineup, and the detectives failed to even question an obvious suspect, the victim's partner with whom she had been feuding. Pollard spent fifteen months imprisoned at Rikers Island before the charges were dropped.

159. The misconduct in the 75th Precinct may have been unusually severe, but the policy, practice, or custom of the misconduct described above pervaded the broader NYPD around the time of Negron's murder investigation. At that time, the City also had a custom, policy, or practice of failing to properly supervise its officers and maintaining grossly inadequate mechanisms for identifying, monitoring, and disciplining police corruption and misconduct. After an exhaustive investigation, the Mollen Commission concluded that "police supervision was in a state of crisis" and that "[t]he Department's management [was] largely to blame for this state of supervision." Mollen Rep. at 79, 82. This lack of supervision allowed misconduct and corruption like the falsification of evidence and falsification of records by police to flourish. The Commission lamented that, "what is particularly troublesome about [police falsifications] is that it is widely tolerated by . . . officers [and] their supervisors." *Id.* at 40. The NYPD's system of supervision and fighting corruption had "virtually collapsed years ago" and "was more likely to minimize or conceal corruption than uncover and uproot it" due to "a deep-seated institutional reluctance to uncover serious corruption." *Id.* at 70, 71. Various additional examples demonstrate how this

misconduct led to wrongful convictions.  In particular:

a.  In 1990, Jonathan Fleming was convicted of a Brooklyn murder based on the testimony of a single admitted crack addict.  The purported witness incredibly testified that she could view Fleming commit the crime from a significant distance.  The witness later recanted, saying that NYPD officers had threatened her with jail time if she did not implicate Fleming.  Fleming was arrested and prosecuted, though the NYPD was aware of significant evidence proving that he had actually been in Florida at the time of the crime.  He spent 24 years in prison for a crime he did not commit before being exonerated in 2014.

b.  William Lopez was wrongfully convicted of a 1989 murder that happened in the basement of a Brooklyn crack house.  Investigators ignored significant evidence of Lopez's innocence that pointed to the true perpetrator.  Most notably, the shooter was described as "man taller than six feet, three inches, with black skin"; Lopez is light-skinned and five foot, seven inches tall.  As in Mr. Connor and Mr. Wagstaffe's case, Lopez was convicted of the murder based on the false testimony of a crack addict and prostitute.  The witness was pressured into telling the police that Lopez was the shooter, and she had falsely selected Lopez's picture from a photo array.  The NYPD suppressed the fact that the witness, who had been arrested on a prostitution charge, was promised leniency in exchange for implicating Lopez.  The witness has since recanted, and Lopez was released after spending twenty-three years in prison for a crime he did not commit.

c.  Derrick Deacon was arrested in 1989 and ultimately convicted of a Brooklyn

murder that he did not commit.  NYPD officers ignored evidence pointing to Deacon's innocence, including that he did not match the description of the perpetrator, and they instead pressured a witness into implicating Deacon in the crime.  Though the witness did not wish to implicate Deacon, the police threatened her with the potential loss of custody over her children if she failed to cooperate with their false story of the crime.  After his conviction was vacated, Deacon was retried but acquitted after just nine minutes of jury deliberation.  He spent twenty-four years wrongfully imprisoned.

d.   Jabbar Collins was convicted of murdering a rabbi during a Brooklyn robbery in 1994.  Three witnesses testified against him, one of whom was severely drug addicted.  Though the prosecutor denied that they had been offered anything for their testimony, at least one witness testified that he was threatened with violence and incarceration if he did not implicate Collins.  Collins spent fifteen years in prison for a crime he did not commit, and he recently settled a civil suit with the city for 10 million dollars.

e.   Around the time of Negron's murder investigation, similar misconduct led to the wrongful convictions of additional individuals, including: Derrick Hamilton, Rosean Hargrave, John Dwayne Bunn, Carlos Davis, Charles Shepherd, and Anthony Faison.

160.   The City of New York, by and through its final policymakers, also had in force and effect during the Negron murder investigation and for years beforehand, a policy, practice or custom of failing to adequately account for and preserve forensic evidence in the City's possession, in particular by prematurely destroying forensic evidence, withholding or destroying biological

evidence sought by inmates for post-conviction DNA testing, and failing to train and supervise its employees who were custodians of biological and forensic evidence. These customs or practices also contributed to wrongful convictions during this time, including those of some of the individuals listed above.

## DAMAGES

161.    The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the City and Police Defendants caused Mr. Connor and Mr. Wagstaffe to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced Mr. Wagstaffe to serve nearly twenty-three years in jail and prison for a brutal crime he did not commit.

162.    As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Wagstaffe sustained injuries and damages, which continue to date and will continue into the future, including: loss of freedom for nearly twenty-three years; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; legal expenses; loss of income; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

163.    Specifically, and as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Mr. Wagstaffe sustained physical injuries and damages, including: physical pain and suffering; personal injuries; infliction of physical illness; and inadequate medical care, for which he is entitled to monetary relief.

164.    When Everton Wagstaffe was falsely arrested for this crime, he had a good ongoing relationship with his girlfriend and other friends and had cordial ongoing relationships with various family members, including his mother, brothers, sisters and father, all of which relationships were cut off, aside from occasional prison visits, for the remainder of his imprisonment for nearly twenty-three years.

165.    Defendants' unlawful actions also caused Everton Wagstaffe to suffer significant mental anguish; social stigma; restrictions on liberty; loss of property; interference with familial relationships; and financial burdens.

166.    All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

**FEDERAL CLAIMS**

**COUNT I**
**42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution**
*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1–10*

167.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

168.    Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, with malice and knowing that probable cause did not exist to arrest Everton Wagstaffe and prosecute him the murder and kidnapping of Jennifer Negron, acting individually and in concert caused Everton Wagstaffe to be arrested, charged, and prosecuted for that crime, thereby violating Eveton Wagstaffe's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

169.     Specifically, these Defendants, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Everton Wagstaffe and would have impeached witnesses for the prosecution at trial, including but not limited to the fact that the identifications of Everton Wagstaffe and Reggie Connor as culprits were the result of impermissible suggestion and/or coercion, and that the police had fabricated inculpatory evidence and withheld exculpatory and impeachment evidence.  These Defendants also failed to conduct a constitutionally adequate investigation in light of evidence pointing to other suspects and away from Everton Wagstaffe and Reggie Connor.

170.     These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Everton Wagstaffe's clearly established constitutional rights.  No reasonable officer in 1992 would have believed this conduct was lawful.

171.     Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron. The prosecution finally terminated in Mr. Wagstaffe's favor on September 17, 2014, when the conviction was vacated and the indictment dismissed.

172.     As a direct and proximate result of these Defendants' actions, Everton Wagstaffe spent additional years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT II
**42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation**
*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1–10*

173.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

174.    Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, acting individually and in concert, deprived Everton Wagstaffe of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial.

175.    These Defendants deprived Everton Wagstaffe of his right to a fair trial by fabricating inculpatory evidence and intentionally using unduly suggestive identification procedures and/or direct suggestion and/or coercion to obtain witness identifications, including without limitation: fabricating the false identifications of Everton Wagstaffe and Reggie Connor by Brunilda Capella; fabricating a false statement from Carrice Coles; and fabricating and/or inducing the false identifications of the Bonner car by Capella and Coles.

176.    These Defendants deprived Everton Wagstaffe of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including without limitation: handwritten notes indicating another lead; evidence that these Defendants were investigating Reggie Connor and Everton Wagstaffe before they were purportedly identified by Brunilda Capella; that the Bonner car could not have been used in the crime; and the circumstances of the witness interviews with Capella and Coles, which would have shown that the identifications of Connor, Wagstaffe, and the Bonner car were fabricated and/or the result of suggestion or coercion.

177.    These Defendants deprived Everton Wagstaffe of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by: failing to conduct forensic testing on the headband found in the Bonner car; failing to investigate Connor and Wagstaffe's whereabouts at the time of the crime; and failing to properly

investigate who might have killed Negron by speaking with her friends, acquaintances, or classmates, particularly after Mayra Rodriguez told detectives that Connor, Wagstaffe, and Corey Bonner were not the three men she had seen in the lobby on the night of the crime.

178.    These Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Everton Wagstaffe's clearly established constitutional rights.  No reasonable officer in 1992 would have believed this conduct was lawful.

179.    Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron. The prosecution finally terminated in Mr. Wagstaffe's favor on September 17, 2014, when the conviction was vacated and the indictment dismissed.

180.    As a direct and proximate result of these Defendants' actions, Everton Wagstaffe was wrongly convicted and imprisoned for nearly twenty-three years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT III
### 42 U.S.C. § 1983 Failure to Intercede
*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1–10*

181.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

182.    By their conduct and under color of state law, Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, had opportunities to intercede on behalf of Everton Wagstaffe to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

183.    These Defendants' failures to intercede violated Everton Wagstaffe's clearly

established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable police officer in 1992 would have believed that failing to intercede to prevent these Defendants from fabricating inculpatory evidence, intentionally using unduly suggestive identification procedures and/or direct suggestion and/or coercion to obtain witness identifications, withholding material, exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Everton Wagstaffe to be arrested and prosecuted without probable cause, were lawful.

184.    Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron. The prosecution finally terminated in Mr. Wagstaffe's favor on September 17, 2014, when the conviction was vacated and the indictment dismissed.

185.    As a direct and proximate result of these Defendants' actions, Everton Wagstaffe was wrongly convicted and imprisoned for nearly twenty-three years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IV
### 42  U.S.C. § 1983 Civil Rights Conspiracy
*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, Does # 1–10, and Coles*

186.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

187.    Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, acting within the scope of their employment and under color of state law, and Defendant Carrice Coles, agreed among themselves and with other individuals, including Brunilda Capella, to act in concert in order to deprive Everton Wagstaffe of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest,

46

false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

188.    In furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

a.    Falsely arresting and imprisoning Everton Wagstaffe, knowing that they lacked probable cause;

b.    Fabricating inculpatory evidence in reports and pretrial communications with the prosecution, including the purportedly independent identifications of Everton Wagstaffe, Reggie Connor, and the Bonner car;

c.    Committing perjury during hearings and trials; and

d.    Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* material during the pendency of the case.

189.    Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron. The prosecution finally terminated in Mr. Wagstaffe's favor on September 17, 2014, when the conviction was vacated and the indictment dismissed.

190.    As a direct and proximate result of Defendants' actions, Everton Wagstaffe was wrongly convicted and imprisoned for nearly twenty-three years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V
### 42 U.S.C. § 1983 Supervisory Liability
*Against Race, Hohenstein, and Doe #1*

191.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

192.    The individual defendant police officers, and/or detectives, Wright, Curran,

Carbone, Brooks, Hecker, Duggan, and Does # 2-10, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Michael Race and other supervisors, in this case and as a matter of practice.

193.   Defendant Michael Race and other supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant police officers, and thereby caused the individual defendant police officers to deprive Everton Wagstaffe of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

194.   Had Defendant Michael Race and other supervisors not provided grossly inadequate training, supervision, and discipline of the defendant police officers, these defendants would not and should not have used unduly suggestive identification procedures and/or direct suggestion and/or coercion to obtain witness identifications of Reggie Connor and Everton Wagstaffe, fabricated inculpatory evidence, committed perjury, withheld exculpatory and impeachment evidence, and intentionally and maliciously caused Everton Wagstaffe to be arrested and prosecuted without probable cause.  Defendants Michael Race and other supervisors were directly involved in the investigation of Everton Wagstaffe and directly supervised the specific investigative acts taken by the individual police officer defendants in this case.

195.   The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants Michael Race and other supervisors under color of state law violated their clearly established duty, in 1992, to supervise defendants Wright, Curran, Carbone, Brooks, Hecker, Duggan, and Does # 2-10,  and no reasonable police supervisor in 1992 would have believed that

grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

196.     Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron.  The prosecution finally terminated in Mr. Wagstaffe's favor on September 17, 2014, when the conviction was vacated and the indictment dismissed.

197.     As a direct and proximate result of these Defendants' actions, Everton Wagstaffe was wrongly convicted and imprisoned for nearly twenty-three years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI
### 42 U.S.C. § 1983 *Monell* Claim

***Monell* Unconstitutional Policy, Custom, or Pattern and Practice of Promoting, Facilitating, or Condoning Improper, Illegal, and Unconstitutional Investigative Techniques and Failure to Supervise, Discipline and Train**
*Against Defendant City of New York*

198.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

199.     Prior to and at the time of the unlawful investigation, prosecution, and conviction of Reggie Connor and Everton Wagstaffe, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, including but not limited to the following: (a) the use of unreliable informants and/or the reliance on witness statements that law enforcement knew or should have known were false; (b) the use of suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false statements; (c) the fabrication of inculpatory evidence; (d) the suppression of exculpatory and/or impeachment evidence; (e) the intentional failure to conduct adequate investigations of crimes;

and (f) engaging in the affirmative concealment and cover up of this type of misconduct.

200.    Prior to and at the time of the unlawful investigation, prosecution, and conviction of Reggie Connor and Everton Wagstaffe, the NYPD, by and through its final policymakers, maintained a policy, custom, or pattern and practice of failing to adequately supervise, discipline and train NYPD detectives and officers in connection with fundamental investigative tasks implicating the constitutional rights of witnesses and suspects, including but not limited to using police informants, conducting custodial interrogations and witness interviews, documenting and disclosing exculpatory and impeachment evidence to prosecutors, and the affirmative ongoing obligation to come forward with exonerating evidence.

201.    The NYPD's policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional investigative techniques, and its policy, custom, or pattern and practice of failing adequately supervise, discipline and train NYPD detectives and officers was reflected by the multiple acts of misconduct and illegality committed by multiple NYPD detectives and supervisors in relation to multiple witnesses in the Connor/Wagstaffe investigation, as described above, as well as by the findings of the Mollen Commission identified in paragraphs 1, 121, 122, and 201, above.

202.    The NYPD's policy, custom, or pattern and practice of investigative misconduct and failure to supervise and train was also reflected in numerous prior cases and investigations within the 75th precinct and beyond which, upon information and belief, were known to the NYPD defendants and policymakers prior to and during the Connor/Wagstaffe investigation.   The misconduct committed in those cases was actually or constructively known to NYPD supervisors and policymakers prior to and during the Connor/Wagstaffe investigation, and, upon information and belief, NYPD supervisors and policymakers failed to train, supervise, discipline, or otherwise

remediate detectives and officers in response to such notice or make any meaningful investigation into the above practices and techniques. The continued adherence to these unconstitutional municipal customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of criminal defendants like Everton Wagstaffe and Reggie Connor.

203. Such unconstitutional municipal customs, practices and/or policies were the moving force behind the false evidence used against Everton Wagstaffe, causing his arrest, prosecution, and nearly twenty-three years of incarceration, as well as all the other grievous injuries and damages set forth above.

### *Monell* Unconstitutional Custom or Policy of Failing to Adequately and Faithfully Account For and Preserve Forensic Evidence in the City's Possession under *Newton v. City of New York*
### *Against Defendant City of New York*

204. Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

205. The City of New York, by and through its final policymakers, maintained a custom, policy, or practice of withholding or destroying biological evidence sought by inmates for post-conviction DNA testing.

206. The City of New York, by and through its final policymakers, also maintained a custom, policy or practice of failing to train and supervise its employees who were custodians of biological evidence sought by inmates for post-conviction DNA testing on how to maintain such evidence.

207. These customs, policies or practices were the moving force behind the violation of Everton Wagstaffe's Fifth and Fourteenth Amendment rights to a fair trial, not to be deprived of liberty without due process of law, and of access to the courts.

208. As a direct and proximate result of Defendant's deficient evidence management

system and/or grossly negligent, reckless, or deliberately indifferent failure to adequately and faithfully account for, preserve, and/or turn over forensic evidence in the City's possession to Everton Wagstaffe for use in his appeals, Mr. Wagstaffe was prevented from vindicating his liberty interest in demonstrating his innocence, in violation of his Fourteenth Amendment right to due process.

209.    Defendant's customs, policies or practices caused wrongful conduct, including, without limitation, the premature destruction of the black headband and rape kit swabs; the years of delay in locating fingernail, hair evidence, and other evidence which contributed to the deterioration of some of the potentially exculpatory samples and prevented timely access to exculpatory DNA evidence; and the failure to locate the victim's shirt and bra, which remains in NYPD custody but has yet to be located or disclosed.  The City lacked proper procedures to ensure adequate maintenance and preservation of this evidence, and/or to ensure that it was accessible to Mr. Wagstaffe during his appeals and subsequent court proceedings.

210.    As a direct and proximate result of Defendants' actions, Everton Wagstaffe spent additional years wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## STATE LAW CLAIMS

### COUNT VII
### Malicious Prosecution

*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1–10*

211.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

212.    Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, despite knowing that probable cause did not exist to arrest and prosecute Everton

Wagstaffe for the murder and kidnapping of Jennifer Negron, intentionally, recklessly, and with malice caused Everton Wagstaffe to be arrested and prosecuted for the murder and kidnapping of Jennifer Negron, and to be convicted of her kidnapping. Furthermore, these Defendants intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Everton Wagstaffe, including but not limited to the facts that the purportedly independent identifications of Everton Wagstaffe and Reggie Connor were the product of unduly suggestive identification procedures and/or direct suggestion and/or coercion, that the Bonner car could not have actually been used in the crime, and that the police had fabricated inculpatory evidence and withheld exculpatory and/or impeachment evidence.

213.    Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron. The prosecution finally terminated in Mr. Wagstaffe's favor on September 17, 2014, when the conviction was vacated and the indictment dismissed. He was subsequently released from custody.

214.    As a direct and proximate result of these Defendants' actions, Everton Wagstaffe was wrongly convicted and imprisoned for nearly twenty-three years and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT VIII**
**Intentional, Reckless, or Negligent Infliction of Emotional Distress**
*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1–10*

215.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

216.    The improper, deliberate, and traumatizing conduct of Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, in deliberately causing, or recklessly disregarding the risk of causing, the wrongful prosecution, conviction, incarceration,

and concomitant severe emotional distress, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

217.    In the alternative, Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan and Does # 1-10, negligently and grossly negligently, and in breach of their duties owed to Everton Wagstaffe to, *inter alia*, refrain from relying on statements from informants and/or witnesses that these Defendants knew or should have known were false; refrain from fabricating evidence; refrain from using suggestive techniques and/or direct suggestion and/or coercive techniques in interviews and interrogations to obtain false witness statements; disclose material exculpatory and/or impeachment evidence; and otherwise act to deny Everton Wagstaffe due process of law, directly and proximately caused Everton Wagstaffe to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for nearly twenty-three years. Defendants' actions unreasonably endangered Everton Wagstaffe's physical health and safety, and caused him to suffer physical harm, including physical ailments resulting from the circumstances and duration of his wrongful incarceration.

218.    These Defendants engaged in these acts within the scope of their employment.

219.    These claims are tolled as these Defendants concealed from Everton Wagstaffe – and still are concealing to this day – their conduct giving rise to this cause of action.

## COUNT IX
## State Law Negligence
*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1–10*

220.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

221.    Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, are liable for negligence, having breached their duty of reasonable care to Everton

Wagstaffe. Specifically and by way of example, these Defendants:

a.  failed to accurately report how Mr. Connor and Mr. Wagstaffe became suspects in the crime and/or how these Defendants obtained their names in connection with the crime;

b.  failed to accurately report the circumstances of Brunilda Capella's false identifications of Mr. Wagstaffe and Mr. Connor as persons who abducted Jennifer Negron, and of statements from other individuals, including Carrice Coles, regarding them, the Bonner car, and the black headband;

c.  failed to accurately report the circumstances of Capella's purportedly independent identification of the Bonner car or Betty Bonner's account of the car's whereabouts on the night of the crime; and

d.  failed to properly investigate leads in the investigation which suggested that Everton Wagstaffe was not involved.

222.    These Defendants also negligently failed to have or adhere to adequate policies and procedures for preserving and tracking physical evidence in their possession.  These negligent acts led to years of delay in disclosing hair and other physical evidence to Mr. Wagstaffe and Mr. Connor, thus extending the amount of time they spent wrongfully imprisoned.  These negligent acts led also to the purported loss of the victim's shirt and bra, which are likely to contain additional exculpatory DNA evidence with which Mr. Wagstaffe and Mr. Connor could have earlier demonstrated their innocence.

223.    These Defendants' negligence and gross negligence directly and proximately caused Everton Wagstaffe to be wrongfully prosecuted and imprisoned for nearly twenty-three years and/or extended the length of time he was wrongfully imprisoned.

224.    These Defendants engaged in these acts within the scope of their employment.

225.    Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron.  Everton Wagstaffe's cause of action for negligence was unavailable to him until the prosecution finally terminated in his favor on September 17, 2014, when the conviction was vacated and the indictment dismissed.  These claims are tolled as these Defendants concealed from Everton Wagstaffe—and still are concealing to this day—their conduct giving rise to this cause of action.

### COUNT X
***Respondeat Superior* Claim**
*Against Defendant City of New York*

226.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

227.    At all times relevant to this Complaint, Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, acted as agents of the City of New York, in furtherance of the business, including law enforcement functions, of the City of New York, and within the scope of their employment or agency with the City of New York.

228.    The conduct by which the Police Defendants committed the torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence was not undertaken for the Police Defendants' personal motives, but rather was undertaken while the Police Defendants were on duty, carrying out their routine investigative functions as detectives and police officers.

229.    Under the doctrine of *respondeat superior*, the City of New York is liable for their agents' state law torts of malicious prosecution, intentional, reckless or negligent infliction of emotional distress, and negligence.

## COUNT XI
## New York State Constitution

*Against Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1–10*

230. Plaintiff hereby incorporates by reference all the foregoing paragraphs and further alleges as follows:

231. The conduct of Defendants Race, Wright, Curran, Carbone, Hohenstein, Brooks, Hecker, Duggan, and Does # 1-10, described above, also violated Mr. Wagstaffe's rights under the New York State Constitution, Article I, §§ 6 and 12, to due process of law and to be free from unreasonable searches and seizures.

232. Everton Wagstaffe is completely innocent of the kidnapping and murder of Jennifer Negron. The prosecution finally terminated in Mr. Wagstaffe's favor on September 17, 2014, when the conviction was vacated and the indictment dismissed.

233. As a direct and proximate result of these Defendants' actions, Mr. Wagstaffe was wrongly imprisoned for nearly twenty-three years and suffered the other grievous and continuing damages and injuries set forth above.

234. Defendant City of New York is liable under *respondeat superior* for the actions of its employees within the scope of their employment.

**WHEREFORE**, Everton Wagstaffe prays as follows:

(a) That the Court award compensatory damages to him and against the defendants, jointly and severally, in an amount to be determined at trial;

(b) That the Court award punitive damages to him against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

(c) For a trial by jury;

(d) For pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e) For any and all other relief to which he may be entitled.

Dated:    New York, New York
         December 11, 2015

/s/Myron Beldock
Myron Beldock
Marc A. Cannan
BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, 26th Floor
New York, New York 10016
(212) 490-0400
*Attorneys for Plaintiff Everton Wagstaffe*

/s/Irving Cohen
Irving Cohen
233 Broadway Suite 2701
New York, NY 10279
(646) 480-1181
*Co-Counsel for Plaintiff Everton Wagstaffe*

58

VERIFICATION

STATE OF NEW YORK     )
                        :     ss.:
COUNTY OF NEW YORK   )

         MYRON BELDOCK, being duly sworn, states:

         I am an attorney for the plaintiff in the within action and my office is located at 99 Park Avenue, Suite 2600, New York, New York, which is within the County of New York. This verification is made by me because the plaintiff is not within the County of New York, which is the county where I have my office.

         I have read the foregoing Complaint and know its contents. The factual allegations are made to my knowledge or upon information and belief, and are based on my investigations, the contents of my files and discussions with plaintiff and witnesses. The complaint is true to my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

                                  MYRON BELDOCK

Sworn to before me this
11th day of December, 2015

Notary Public

MARC A. CANNAN
NOTARY PUBLIC, State of New York
No. 02CA6265836
Qualified in Queens County
Commission Expires 07/16/2016